FILED

2005 Jul-29  PM 09:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **TIMOTHY ROCHA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **VS.** | ) | **CASE NO. <u>CV-03-PWG-0071-NE</u>** |
| | ) | |
| **GENERAL ELECTRIC COMPANY,** | ) | |
| **A corporation** | ) | |
| **Defendant.** | ) | |

**<u>PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT THEREOF</u>**

## TABLE OF CONTENTS

Page No.

I.    INTRODUCTION                                                          3

II.   PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF        3-14
      UNDISPUTED FACTS

            THE MIKE GARNER INCIDENT                                    6-8

            THE EMPLOYEE ASSISTANCE PLAN                         8-9

            ROCHA'S REFERRAL TO THE EAP                             9-11

            ROCHA QUITS ALBANY CLINIC WITHOUT NOTICE TO GE      12-14

      PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS              14-25

            JOAN JEFFREYS                                                    14-17

            JEFFREYS SENDS ROCHA TO EAP                           17-18

            MIKE THORPE                                                       18-20

            ROCHA'S VOLUNTARY TREATMENT AT THE ALBANY CLINIC    20

            GARNER'S CONFRONTATION WITH ROCHA                20-22

            MIKE GARNER                                                      22-23

            DORIS GOAD                                                        23-24

            LACK OF INVESTIGATION                                      24

            ROCHA LEAVES ALBANY CLINIC                             24-25

III.  ARGUMENT                                                            25-32

      A.    GE is entitled to summary judgment on Plaintiff's gender discrimination    25
            claim.

      B.    GE is entitled to summary judgment on Plaintiff's claims of perceived    25
            disability under the American with Disabilities Act.

C.    GE is entitled to summary judgment on any possible discrimination claim   25
        under the ADA.

D.    1.    Plaintiff is entitled to recover for violation of his rights pursuant to   26
            42 U.S.C. Section 12112(d)(4).

      2.    Plaintiff does have standing to sue for violations of 42 U.S.C.   26-27
            Section 12112(d).

      3.    GE is not entitled to summary judgment because the medical   27-32
            examinations and the inquiries were not job related nor
            were they consistent with a business necessity.

            a.    The initial mandatory EAP referral.   28-29

            b.    GE's continued requirements of medical examination and   30-32
                  inquiries.

D.    GE is entitled to summary judgment on Plaintiff's retaliation claim   32
        regarding his workmen's compensation benefits.

IV.    **CONCLUSION**   33


       **CERTIFICATE OF SERVICE**   33

## I.  INTRODUCTION

The Plaintiff in this action Timothy Rocha (hereinafter referred to as "Rocha") prosecutes this action against the Defendant, General Electric Company (hereinafter referred to as "GE") for violation of Rocha's rights under 42 USC Section 12112(d)(4) for illegally requiring Rocha to submit to continuous medical exams and inquires that were not related to his employment with GE nor consistent with any business necessity of GE's, and for which Rocha suffered mental and emotional anguish.

## II.  PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS

1. Admitted.

2. Admitted.

3. Admitted.

4. Admitted.

5. Denied.

6. Admitted.

7. Admitted.

8. Denied.

9. Admitted to the extent that this reflects Hallman's deposition testimony, otherwise, denied.

10. Denied.

11. Admitted to the extent that this reflects Jeffreys' deposition testimony, otherwise, denied.

12. Admitted to the extent that this reflects Jeffreys' deposition testimony, otherwise, denied.

13. Admitted to the extent that this reflects Jeffreys' deposition testimony, otherwise, denied.

14. Admitted to the extent that this reflects Jeffreys' deposition testimony, otherwise, denied.

15. Admitted to the extent that this reflects Jeffreys' deposition testimony, otherwise, denied.

16.  Denied.  Cannon has never had a confrontation or problem with Rocha.  Cannon never felt intimidated, threatened nor afraid of Rocha, nor did anyone at GE ever express this to Cannon.  (Cannon Depo., pp. 45-55).  On one occasion Rocha did ask Cannon to wrestle.  This did not make Cannon nervous, nor did Cannon take this as to be intimidating.  Rocha was not mad at him nor was Cannon mad a Rocha.  (Cannon Depo., pp. 57-58).

17.  Admitted to the extent that this reflects Jeffreys' deposition testimony.  Rocha denies that he ever assaulted Billy Turney nor has GE produced any such evidence. (Rocha affadavit para. 10).

18.  Admitted to the extent that this reflects Jeffreys' deposition testimony, otherwise, denied. Furthermore, Jerry Waites also corroborates Rocha's denial to this allegation.   In approximately 1993/1994, Waites worked in the warehouse with both Rocha and Renee Nowak.   Nowak was a troublemaker who tried to put Waites and Rocha at odds with each other.  Shortly after Rocha came into the warehouse, Nowak went to the warehouse supervisor, Bill Crutcher, and reported that Rocha was not doing his job.  Nowak then went to Rocha and told Rocha that Waites had actually reported to Crutcher. Rocha, in turn, approached Waites and asked him about this, which Waites denied.  Waites then asked Rocha who had accused Waites of doing this and Rocha informed him Nowak.  Rocha and Waites then approached Nowak and questioned her about this.  Nowak denied making any such comments, either to Crutcher or Rocha.  While Waites became very angry, Rocha remained calm and actually calmed Waites down.  (Waites Declaration, para. 3 and Rocha affadavit, para. 7).

19.  Admitted to the extent that this reflects Jeffreys' deposition testimony, otherwise, denied.

20.  Admitted.

21.  Denied.  Rocha did not lose his temper with anyone, "It was just getting the job done, chop chop.  Not so much being angry at someone, just being inside, built inside.  I wouldn't vent it on no one.

. . .  I don't remember losing my temper at work . . . frustrated maybe, maybe aggravated, trying to get my orders done or something."  (Rocha Depo., p. 108).

**THE MIKE GARNER INCIDENT**

22.  Admitted.

23.  Admitted.

24.  Denied.  As shown by Rocha's deposition testimony above, he had not "lost his temper" at work.  This is corroborated by Rocha's co-employees, Jerry Waites and Doris Goadt.  (Waites Declaration, para. 4; Goad Declaration, para. 3; Rocha affadavit, para. 2).

25.  Admitted.

26.  Admitted.

27.  Admitted.

28.  Admitted.

29.  Admitted to the extent that the statements in paragraph 29 reflect Garner's deposition testimony, otherwise, denied.

30.  Admitted to the extent that the statements in paragraph 30 reflect Garner's deposition testimony, otherwise, denied.

31.  Admitted to the extent that the statements in paragraph 31 reflect Garner's deposition testimony, otherwise, denied.  Larry Cannon, who was present during the incident between Rocha and Garner testified that both Rocha and Garner "got in each others faces", that the confrontation was purely verbal and it was not physical, no one hit nor shoved the other.  (Cannon Depo., pp. 47-49).

32.  Admitted.

33.  Denied.  On August 24, 2001, at approximately 7:00 p.m., Hallman approached Thorpe and told Thorpe that he wanted to transfer out of the warehouse.  When Thorpe asked why, Hallman allegedly told Thorpe that there was a "incident" between Garner and Rocha.  (Thorpe Depo., p. 49).

34.  Denied.  See response to 33 above.

35.  Admitted.

36.  Admitted.

37.  Admitted.

38.  Admitted to the extent that the statement in paragraph 38 reflects Hallman's' deposition testimony, otherwise, denied. Although Jeffreys had sent Rocha to EAP in March of 1997 based on allegations of confrontational behavior with coworkers, it is undisputed that Rocha took no retaliatory action against those employees who allegedly complained to Jeffreys. (Whitten Depo. Pp. 30-33).

39.  Admitted to the extent that the statement in paragraph 39 reflects Hallman's deposition testimony, otherwise denied.

40.  Admitted to the extent that the statement in paragraph 40 reflects Hallman's deposition testimony, otherwise denied.

41.  Admitted to the extent that the statement in paragraph 41 reflects Hallman's deposition testimony, otherwise denied.

42.  Admitted.

43.  Admitted to the extent that the statement in paragraph 43 reflects Hallman's deposition testimony, otherwise denied.

44.  Admitted.

45.  Admitted to the extent that the statements contained in paragraph 45 reflect Whitten's deposition testimony, otherwise, denied. Hallman did not ask Rocha to move from the entrance to the

railcar. Hallman did not give Whitten any basis nor reason for his fear or belief that Rocha might retaliate against him for his complaint. (Whitten Depo. pp.36-37).

46.   Admitted to the extent that the statements contained in paragraph 46 reflect Whitten's deposition testimony, otherwise, denied.

47.   Admitted to the extent that the statements contained in paragraph 47 reflect Whitten's deposition testimony, otherwise, denied.

48.  Admitted.

49.  Admitted.

50.  Admitted.

51.  Admitted.

52.  Admitted.

53.  Admitted.

54.  Admitted.

55.  Admitted.

56.  Admitted.

57.  Admitted.

58.  Admitted.

59.  Admitted.

60.  Admitted.

61.  Admitted.

**THE EMPLOYEE ASSISTANCE PLAN**

62.  Admitted.

63.  Admitted.

64.  Admitted.

65.  Denied.  EAP is a brief counseling, which a client can self refer and deals with more issues of life, stress related, maybe family issues and grief.  (Pellant Depo., p.14).

66.  Admitted.

67.  Admitted.

**ROCHA'S REFERRAL TO THE EAP**

68.  Admitted.

69.  Denied.  Employees given a mandatory referral to GE's Employee Assistance Program are required to sign a release so GE can gather information regarding the employee from the Albany Clinic.  (Hamilton Depo., pp. 24-25).  Linda Brooks also informed Pellant that Rocha was to sign a release allowing Pellant to communicate with GE regarding the status of Rocha's condition and any prescribed treatment plan.  (Exhibit 2 to Pellant's Depo.).

70.  Admitted.

71.  The statements in paragraph 71 are denied to the extent that Rocha's personal problems "affected" is ability to work.  Pellant's progress notes of August 30, 2001, and September 6, 2001, do not reflect any opinions or belief that Rocha's personal problems affected his ability to work.  (Exhibits 3, 4 and 5 to Pellant's Depo; Exhibit 18 to Hamilton's Depo.See also Rocha affadavit, para. 14).

72.  Denied. As of September 4, 2004, Rocha had been released to return to work with no restrictions and he did not pose a threat of violence nor harm to anyone at GE.  (Whitten Depo., pp. 81-82; Exhibit 24 to Whitten's Depo.).  GE can produced no documentation to support that Rocha was mandated to continue his treatment at the Albany Clinic.(Whitten Depo., pp. 95-97).

73.  Admitted as to Alabama law requiring a return to work recommendation to come from a doctoral-level counselor.  The remaining statements of paragraph 73 are denied.  There is no

documentation from Dr. Love to indicate that Rocha was placed on any restrictions with regard to his return to work.  Dr. Love's note of September 10, 2001, makes no mention of any such restrictions. (Defendant's Exhibit 1 to Pellant's Depo.).  Further, it is clear from Pellant's letter to Linda Brooks of September 6, 2001, that Pellant, not Dr. Love, recommended Rocha continue his treatment at the Albany Clinic, keeping regularly scheduled appointments for counseling (not EAP), and medication management.   (Plaintiff's Exhibit 6 to Pellant Depo; Whitten Depo., p.84). GE can produced no documentation to support that Rocha was mandated to continue his treatment at the Albany Clinic. (Whitten Depo., pp. 95-97).

74.  Admitted.

75.  Admitted.

76.  Denied to the extent that Rocha's return to work was conditioned upon compliance with prescribed medication and scheduled appointments.  Rocha had been voluntarily seeking counseling from the Albany Clinic since July 5, 2001.  (Exhibit 1 to Plaintiff's Evidentiary Submissions; Rocha Depo., pp. 80-81).  This counseling was in connection with issues involving the death of Rocha's son. (Rocha affadavit, para. 11).  In connection with this, Dr. Love prescribed Rocha several medications, including Paxil.  (Rocha Depo., p. 75; Defendant Exhibit 2 to Pellant's Deposition).  In fact, Pellant first saw Rocha on July 31, 2000, approximately one (1) month prior to Rocha's mandatory EAP referral.  At that time she noted that Rocha needed to continue with his treatment which consisted of counseling with Pellant and medication management with Dr. Love.  (Pellant Depo., p. 52; Plaintiff's Exhibit 1 to Pellant Depo.).  Pellant's treatment plan of September 20, 2001, makes no mention of any mandatory referral from GE; nor no mention of Rocha's return to work with restrictions.  (Plaintiff's Exhibit 1 to Plaintiff's Depo.).

78.   Admitted as to Rocha being returned to work without restrictions.   Denied as to the remaining allegations contained in paragraph 78.   On September 4, 2001, Whitten informed Rocha that the Albany Clinic had returned Rocha to work with no restrictions, with no mention of continued medication management, nor keeping scheduled appointments.   (Exhibit 24 to Whitten Depo.).   Whitten instructed Rocha that when he was released by the Albany Clinic, he would no longer be required to go to the clinic for treatment.   (Hamilton Depo., p. 47; Plaintiff's Exhibit 13 to Hamilton Depo.; Whitten Depo., p. 91). GE can produced no documentation to support that Rocha was mandated to continue his treatment at the Albany Clinic. (Whitten Depo., pp. 95-97; Rocha affadavit, para. 12.).

79.  Denied.  See Plaintiff's response to paragraphs 76 and 78 above.

80.  Denied.  See Plaintiff's response to paragraphs 76 and 78 above.

81.   Denied.   On March 13, 2001, approximately five (5) months prior to the incident between Rocha and Garner, Mike Phillips, then Director of the Albany Clinic, corresponded with Whitten, that upon the request of Rocha, Phillips was informing Whitten that Rocha had missed work on March 8, 2001, due to issues regarding his family and possible hospitalization.   (Exhibit 2 of Plaintiff's Evidentiary Submissions).   Whitten was also aware that Rocha was going through personal issues prior to the August 2001, incident between Rocha and Garner.  (Whitten Depo., p. 79).

82.  Admitted.

83.  Admitted.

84.   Admitted that Pellant notified Brooks on September 13, 2001, regarding Rocha's missed appointment.  Denied as to the remaining portions of paragraph 84.

**ROCHA QUITS ALBANY CLINIC WITHOUT NOTICE TO GE**

85.  Admitted.

86.  Admitted.

87.  Denied.  See Plaintiff's response to paragraphs 76 and 78 above.

88.  Admitted.

89.  Admitted.

90.  Denied as to the statement that Rocha's attendance at the sessions at the Albany Clinic were a condition of employment.  It is further denied that Rocha was in violation of those conditions.

91.  Admitted.

92.  Admitted to the extent that the statements in paragraph 92 reflect Whitten's deposition testimony, otherwise, denied.

93.  Admitted to the extent that the statements in paragraph 93 reflect Whitten's deposition testimony, otherwise, denied.

94.  Admitted.

95.  Admitted to the extent that the statements in paragraph 95 reflect Whitten's deposition testimony, otherwise, denied.  In addition, on November 9, 2001, Larry Hamilton corresponded with Rocha's new counselor at Southern Counseling in Consultation Services, Brenda Baird.  Hamilton informed Baird that Rocha had received a mandatory referral to GE's EAP program managed by the Albany Clinic.  Further that such referral was because of Rocha's "negative behavior, attitude problems, along with harassing and intimidating fellow employees in the workplace."  Hamilton also informed Baird that Rocha had failed to follow through with his appointments at the Albany Clinic, which violated the referral agreement.  Hamilton requested that Baird provide Hamilton with "dates and times

of visits, subject matters covered and diagnosis/assessment of Rocha in writing.  (Exhibit 16 to Hamilton Depo.).

96.   Admitted.   However, on September 13, 2001, Hamilton noted that Pellant had contacted Hamilton regarding Rocha missing an appointment that day.  Pellant admitted that this appointment was a personal session.  Further, Rocha stated that he believed that GE's evaluation process was completed with the Albany Clinic.  (Plaintiff's Exhibit 9 to Hamilton Depo.).

97.   Denied.   Whitten threatened Rocha with termination for discontinuing treatment at the Albany Clinic.  Whitten also threatened Rocha with termination if Rocha did not immediately provide the names and phone numbers of his new doctor and counselor and also required Rocha, under threat of termination, to release information from his new doctor and counselor.  (Whitten Depo., pp. 95, 99, 103).

98.  Admitted.

99.  Denied.  See Plaintiff's response to paragraph 95 above.

100.  Admitted.

101.  Admitted.

102.   Admitted to the extent that paragraph 102 reflects Hamilton's deposition testimony. However, Hamilton's "interpretation of his own request" is not reflected in his letter to Baird.  (Plaintiff's Exhibit 16 to Hamilton's Depo.).

103.   Denied.   Rocha provided a limited release to Southern Counseling to release only information relating to his abilities to perform his duties.  However, Hamilton's request for information regarding Rocha from Southern Counseling was much broader, requesting "dates and times of visits, subject matters covered, diagnosis/assessment" of Rocha.   (Plaintiff's Exhibit 16 to Hamilton's deposition).

104.   Denied.  On November 19, 2001, Baird corresponded with Hamilton, informing him that Rocha presented for his initial assessment on October 2, 2001, with problems related to bereavement, anxiety, depression and conflicts at work.  (Plaintiff's Exhibit 17 to Hamilton Depo.).  On November 19, 2001, Dr. Scott Hellard corresponded with Hamilton, Linda Brooks and Jerry Whitten, informing them that Rocha had presented to Dr. Hellard on October 24, 2001, November 7, 2001, and was scheduled for another follow-up appointment in approximately one (1) month.  That Rocha appeared to be primarily dealing with issues of depression, grief over the loss of a child, anxiety and what he perceived (Rocha), as persistent conflicts at work.  (Exhibit 18 to Hamilton's Depo.).

105.   Admitted.

106.   Admitted to the extent that the statements contained in paragraph 106 reflects Pellant's Deposition testimony, otherwise, denied. (Rocha affadavit, para. 14).

107.   Admitted to the extent that the statements contained in paragraph 107 reflects Pellant's Deposition testimony, otherwise, denied. (Rocha affadavit, para. 14).

**PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS**

### JOAN JEFFREYS

1.  In July of 1996, Joan Jeffreys became Warehouse Manager and is currently in the same position.  (Jeffreys Depo., p. 13).

2.  On October 16, 1996, Jeffreys received an anonymous telephone complaint that an employee had a confrontation with Rocha.  Upon confronting Rocha with the complaint, Rocha denied it. (Jeffreys Depo., pp. 52-54).

3.  After the above incident, Jeffreys alleges she received a complaint from Everett Waldrep, alleging that he observed Rocha following others too closely in his forklift.  (Jeffreys Depo., p. 60).

4.   Waldrep allegedly told Jeffreys that he observed Rocha position his forklift at the base of a ramp leading into a rail car, blocking Kenny Kirby.  Rocha would then sit there and appear to be doing paperwork.  (Jeffreys Depo., p. 61).

5.   Kirby also allegedly told Joan Jeffreys this.  (Jeffreys Depo., p. 61).

6.   Kirby never asked Rocha to move nor did Kirby ever tell Jeffreys he was threatened, afraid, nor intimidated by Rocha.  (Jeffreys Depo., pp. 61, 79-80).

7.   Rocha denies ever intentionally blocking anyone in a rail car with his forklift.  (Rocha affadavit, para. 6).

8.   One of the main duties as a forklift operator in the warehouse is loading refrigerators onto rail car.  Occasionally, two forklift operators will work as a team in loading the rail car.  On these occasions, it would not be unusual for one of the two team members to stop the forklift at the bottom of the ramp to the rail car to complete some paperwork for inventory and tracking purposes.  This may occur while the other member of the team is actually in the rail car loading refrigerators.  (Declaration of Doris Goad, para. 5; Declaration of Jerry Waites, para. 5).

9.   Kirby allegedly told Jeffreys that he had heard Rocha literally every employee on the shift to wrestle.  (Jeffreys Depo., p. 63).  This included Mike Garner, Everett Waldrep, Larry Cannon and Mark Walden.

10.   When questioned regarding this, Waldrep would laugh and say "that kid" (referring to Rocha), was always trying to get him to wrestle.  Waldrep allegedly told Jeffreys this on several occasions, both before and after August 2001.  Waldrep did not appear to be afraid nor intimidated by Rocha.  (Jeffreys Depo., pp. 57-60).

11.  Walden told Jeffreys that he and Rocha had some disagreements but went off site and settled them.  Walden had no problems dealing with Rocha, Rocha did not bother him, nor was Walden intimidated, threatened or afraid of Rocha.  (Jeffreys Depo., pp. 62, 69, 72).

12.  Jeffreys never discussed this allegation with Mike Garner.  (Jeffreys Depo., p. 68).

13.  Several employees allegedly reported to Jeffreys that Rocha had grabbed Billy Turney and pushed him into a coke machine.  Jeffreys questioned Turney about this and he replied "don't worry about it, it's nothing, it's okay."  (Jeffreys Depo., pp. 69-70).

14.  Jeffreys allegedly documented these complaints, however, her documentation was lost. (Jeffreys Depo., pp. 70, 106).

15.  As to the allegations of Rocha threatening Renee Nowak, Jeffreys acknowledged that she believed Nowak's complaint.  Such conduct would be a basis for immediate termination, however, Jeffreys did nothing.  (Jeffreys Depo., pp. 77-78).

16.  After the confrontation between Rocha and Garner in 2001, Linda Mahaffey allegedly reported to Jeffreys that approximately 2 to 3 years earlier, Rocha had challenged her to a fight. Although Jeffreys considered this to be confrontational, threatening, intimidating behavior, she did not document it, nor report it, nor do anything regarding the allegation.  (Jeffreys Depo., pp. 80-85). Rocha denies the accusation (Rocha affadavit, para. 8).

17.  Jeffreys also received an alleged complaint from Joan Mckelvy after the confrontation between Rocha and Garner.  Mckelvy allegedly reported to Jeffreys that 10 to 12 years earlier, she and Rocha had a problem with each other while working on the assembly line.  Rocha was walking down an isle, came up to her, got in her face and said "do you remember back on the case line when you did that" and pointed his finger at her.  Mckelvy asked Rocha what he was talking about and Rocha said "I remember and I haven't forgotten it."  Jeffreys did not document this complaint but did allegedly inform

16

Jerry Whitten about it.  (Jeffreys Depo., pp. 85-86). Rocha denies the accusation (Rocha affadavit, para. 9).

18.  On July 17, 1996, Jeffreys believed that she detected the scent of alcohol of Rocha's breath. Jeffreys contacted the plant nurse, told her she had smelled alcohol on an employee's breath and asked if she could send the employee (being Rocha), over for an evaluation.  Jeffreys then directed Rocha to go see the plant nurse which he did.  Either the nurse or Neil Lumpkin, the Night Shift Manager, called Jeffreys and informed her that they thought Rocha was fine.  Lumpkin asked Jeffreys what her concern was and she said she detected the odor of beer from Rocha.  Jeffries did not know if Rocha was intoxicated, he did not splur his speech nor were his eyes bloodshot, nor did he stumble when he walked. She did not question Rocha about it.  (Jeffreys Depo., pp. 46-50).

19.  Rocha was aware that Linda Mahaffey had several years of marshal arts training and challenged Rocha, telling him that for $100.00, she could "take him."  Rocha told Mahaffey that he was interested in marshal arts and Mahaffey took Rocha to one of the studios where she trained.  (Rocha Depo., pp. 129-130).

20.  Rocha never asked Everett Waldrep to wrestle.  (Rocha Depo., Vol. II, p. 11).

21.  Rocha never pushed Billy Turney against a drink machine.  (Rocha Depo., Vol. II, p. 12).

**JEFFREYS SENDS ROCHA TO EAP**

22.  On March 11, 1997, Jeffreys referred Rocha to GE's Employee Assistance Program provider, i.e., the Albany Clinic, due to the allegations of confrontational behavior with his co-workers. (Jeffreys Depo., pp. 93, 100; Plaintiff's Exhibit 1 to Jeffreys Depo.). The written reminder of March 11, 1997, that Jeffreys gave to Rocha (Plaintiff's Exhibit 1 to Jeffreys Depo), would only stay active for 6 months according to company policy. (Jefferys Depo. P. 146).

23.   The treatment plan from Albany Clinic on Rocha's EAP referral notes "individual and/or family therapy one to four times monthly, prn.   Referral to physician medical assessment, prn.   R/O substance abuse/dependence."   The clinic noted the reported problems to be "a one time assessment for unmanageable temper, alcohol abuse, frustration problems."   Also noted that Rocha suffered from an occupational problem of arguing with supervisor.   (Plaintiff's Exhibit 2 to Jeffreys Depo.).

24.   On March 25, 1997, Mike Phillips, Rocha's counselor at the Albany Clinic, received a call from Jeffreys concerning Rocha's behavior while at work.   Phillips requested from Jeffreys her unofficial documentation as to more information about Rocha's behaviors on the job, explaining that the information on the referral was rather vague.   Jeffreys informed Phillips that she would consult with Linda Brooks and let Phillips know.   Phillips thereafter received a call from Brooks.   Phillips explained his position to Brooks and his inability at that time "to see their point of view."   (Plaintiff's Evidentiary Submission 3).

25.   On March 13, 1997, Rocha filed a grievance against Jeffreys, claiming harassment, false accusations "defamation" of character, favoritism, double standard policy and threats.   (Plaintiff's Exhibit 3 to Jeffrey's Depo.).

26.   From March of 1997, until the confrontation between Rocha and Garner in August of 2001, Jeffreys did not receive any complaints that Rocha was threatening, intimidating nor harassing any employees.   (Jeffreys Depo., p. 138).   If she had received such a complaint during that time period, she would have reported this to Mike Thorpe who would handle any complaints.   (Jeffreys Depo., pp. 142-143.

**MIKE THORPE**

27.   Thorpe did not become aware of any complaints regarding Rocha until after the August 2001 confrontation with Mike Garner.   (Thorpe Depo., p. 22).

28.  Mike Thorpe was Rocha's business team leader from 1997 until Rocha was transferred to a different department in approximately August of 2001.  (Thorpe Depo., p. 16).  In Thorpe's opinion, Rocha did a great job and was very willing to do anything that came up that needed to be done and never complained.  (Thorpe Depo., pp. 17-18; see also Waites declaration, para. 6).  Thorpe never observed any confrontational behavior or Rocha.  (Thorpe Depo., p. 19).

29.  The things that were brought to Thorpe's attention after August of 2001, were "rumors". (Thorpe's Depo., pp. 23-24).

30.  For example, Thorpe heard a "rumor" that Rocha had shoved Billy Turney into a corner by a drinking fountain.  Thorpe could not recall who told him this "rumor", nor did Thorpe pass this along to anyone in management.  Thorpe did nothing to investigate this "rumor", other than to ask Billy Turney if he had any issues or concerns in general to see if anything would come up and Turney did not respond. (Thorpe Depo., pp. 24-25).

31.  Another "rumor" Thorpe heard after August of 2001, was an alleged incident involving Rocha and Renee Nowak, prior to Thorpe coming into the warehouse.  (Thorpe Depo., p. 26).

32.  Thorpe also heard a rumor that Mark Walden and Rocha had some "scuffling matches". Again Thorpe did not follow-up on this because it had happened in the past and he felt that the action taken against Rocha as a result of this confrontation with Mike Garner would take care of the issue. (Thorpe Depo., p. 27).

33.  In his initial deposition Thorpe was specifically asked if he received any other complaints after the Mike Garner incident and Thorpe responded "no and, like I said all those are rumors." (Thorpe Depo. P. 36).

34.  Approximately one week later, Thorpe amended his answer to the above question.  After his initial deposition, Thorpe, after discussion with Jerry Whitten, related a conversation he had with Mike

Garner, where Mike Garner complained that Rocha had been following him on his motorcycle.  (Thorpe Second Depo., pp. 6-7).  In his second deposition, Thorpe also related a conversation he had with Elvis Hallman, where Hallman was complaining that he saw Rocha at the end of his street on a motorcycle. (Thorpe Second Depo., p. 7).  Thorpe did not document either one of these complaints.  (Thorpe Second Depo., p. 10). Rocha denies these accusations (Rocha affadavit, paras. 4 and 5).

**ROCHA'S VOLUNTARY TREATMENT AT THE ALBANY CLINIC**

35. In approximately April of 2000, Rocha began to seek medical treatment from Dr. Love at the Albany Clinic concerning pregrievance as to the death of his son.  (Rocha Depo., p. 75).  Rocha and his wife had discovered in third month of his wife's pregnancy, that being March of 2000, that his son would not survive the birthing process.  (Rocha Depo., pp. 75-78).  Because of this Rocha was off of work a lot before and after the baby was born and died.  Mike Garner and Larry Cannon, and to a lesser extent, Elvis Hallman, were all very critical of Rocha because of the time off he was taking from work and felt that Rocha and his wife should have aborted the baby.  (Declaration of Doris Goad, para. 4).

36.   Rocha continued to seek counseling from the Albany Clinic.  (Plaintiff's Evidentiary Submissions 4 and 5; Rocha Depo., pp. 74-75, 81; Rocha affadvit, para 11).

37.   Rocha felt provoked or harassed at work because of his religious beliefs by Garner, Cannon and Hallman, who often expressed profanity and vulgarities towards Rocha.  Garner would curse Rocha, using vulgar names such God damn, shit, and MF.  (Rocha Depo., 89-94).

38.   Rocha complained about this to his supervisor Mike Thorpe and asked if there was anything Thorpe could do and Thorpe said no.  (Rocha Depo., p. 97).

**GARNER'S CONFRONTATION WITH ROCHA**

39.   On August 22, 2001, at approximately 11:00 p.m., Rocha had pulled up in front of the warehouse office on his forklift truck and was getting his paperwork from his clipboard.  As he

proceeded to walk towards the office, he was about three steps from the office door, when Mike Garner looked directly at him, being only a few feet away, and proceeded to yell directly into Rocha's face, telling him to get his God damn paperwork into the office.  Rocha then asked Garner why he was yelling and cursing and Garner responded so you can get your paperwork into Larry Cannon.  Garner proceeded to tell Rocha that he was "not right."  Rocha replied "pardon me"?  Garner again, still yelling, said "you're not right."  Rocha replied to Garner "who are you to judge me"?  Garner said again to Rocha "you're not right."  Rocha replied to Garner "you're the one that's been married five times."  Garner then said "let's go to Wally World."  Rocha did not reply.  Garner left the office.  Rocha did not curse Garner nor did he bump him intentionally.  Rocha does admit that he accidentally because Garner was in front of the door as Rocha was coming in.  Rocha did not grab Garner's shirt, nor did he invite Garner to "go to Wally World."  Rocha claims he did not report this to anyone because he is not a "tattletale."  (Rocha Depo., Vol. II., pp. 53-60; Defendant's Exhibit 9 to Vol. II of Rocha's Depo.

40.  Jeffreys alleges that the confrontation between Rocha and Garner first came to her attention the morning after the event, as reported to her by Mike Thorpe.  (Jeffreys Depo., pp. 124-125).  However, Thorpe testified that he did not learn of the confrontation until the evening of August 24, 2001.  (Thorpe Depo., p. 32).

41.  Jeffreys testified that it was reported to her that the confrontation was solely between Garner and Rocha (Jeffreys Depo., p. 125), however, in her August 29, 2001, letter to Rocha (Plaintiff's Exhibit 6 to Jeffreys Depo.), Jeffreys stated "it had been brought to our attention that you have been displaying intimidating an threatening behavior towards co-workers."  Jeffreys explained this discrepancy by stating that Cannon and Hallman both thought that Rocha was going to start swinging at everyone.  (Jeffreys Depo., pp. 152-153).  However, Cannon testified that the confrontation was solely verbal, it was not physical, there was no hitting or shoving.  (Cannon Depo., pp. 47-48).

42.   Elvis Hallman was present in the confrontation between Rocha and Garner in August of 2001.  (Hallman Depo., pp. 34-35).  Rocha and Garner were "hollering" at each other.  However, Hallman does not recall what either was saying to the other, nor does he recollect if either one of them were cursing, although Hallman believed the two were about to fight, neither verbally threatened the other.  There might have been a little bit of "bumping" going on.  Both Rocha and Garner were mad and both were yelling and both bumped each other.  (Hallman Depo., pp. 36-37).

43.   Hallman alleges that Jerry Waites, another employee in the warehouse, had a confrontation with Rocha.  However, Waites denies this.  (Hallman Depo., p. 40; Waites Declaration, para. 4).

44.   After the Mike Garner incident, Hallman had no problems nor confrontations with Rocha, nor is he aware of any other employee having any problems or confrontations with Rocha after the Mike Garner incident.  (Hallman Depo., p. 55).

45.   Upon cross-examination and prompting by defense counsel, Hallman then testified that after the Mike Garner incident, he saw Rocha on his motorcycle in the street in front of Hallman's house.  (Hallman Depo., p. 61).  Although the individual had his helmet on and Hallman did not see his face, Hallman believes it was Rocha.  Hallman did not report this to anyone in management.  (Hallman Depo., p. 64).

**MIKE GARNER**

46.   Mike Garner testified that the only confrontational problem that he had with Rocha was the confrontation between himself and Rocha in August of 2001.  (Garner Depo., pp. 32-39).

47.   Prior to the confrontation with Rocha, Garner has had several confrontations with two (2) other GE employees.  The first being Renee Seymor.  (Garner Depo., p. 43).  Garner encountered Seymor sitting in the break room crying.  When he inquired what the problem was, Seymor responded no one needed her.  Garner told Seymor to snap out of it.  Seymor kept going on and on and finally

Garner told Seymor "If you are not here for a reason why just don't you take a gun a blow your brains out if this life is so miserable to you."  (Garner Depo., p. 43).

48.   Whitten verbally reprimanded Garner regarding this incident.  (Garner Depo., p. 44)

49.   At approximately mid 90's Garner had a confrontation with Terry Kellum, a GE employee who Garner thought was having an affair with his wife, who is also a GE employee.  Kellum had had an affair with Garner's wife prior to Garner marrying her.  After the marriage, Kellum began showing up in Garner's wife's work area or calling her at work.  Garner's wife had mixed emotions because she and Kellum had been involved for years and there were still feelings between them.  Employees were coming to Garner unsolicited and informing him of this.  (Garner Depo., pp. 45-49).

50.   On the first occasion, Garner approached Kellum while on GE property warning him to stay away from his wife.  (Garner Depo., p. 49).

51.   Kellum did not abide by Garner's request.  Garner began getting more reports that Kellum was still in his wife's work area.  Consequently, Garner approached Kellum a second time, this time not on GE property.  (Garner Depo., p. 50).

52.   On the second occasion Kellum had convinced Garner's wife to get in a car together and go with him to talk.  Garner caught them in a car together in a street in Decatur.  Garner approached the car and again told Kellum to "leave them alone."  Garner probably cursed Kellum.  (Garner Depo., pp. 50-52).

53.   GE was aware of the confrontation between Garner and Kellum.  (Garner Depo., p. 54).

**DORIS GOAD**

54.   In October of 2001, Doris Goad was instructed by Mike Thorpe to assist Larry Cannon in the warehouse office.  As she was doing so, Cannon came into the office, looked at Goad and said "you are sitting there doing my job, what am I suppose to do."  Goad responded that Thorpe had directed her

to come in and assist Cannon.  Cannon continued to stand over Ms. Goad.  She suggested that Cannon see if the trucks were set up and ready for the drivers.  Cannon responded "now you are trying to tell me what to do."  Goad told him no, that she was just trying to do the paperwork as she had been directed by Thrope.  Cannon then began cursing Goad telling her "you are in my paperwork, you are doing my job", and cursing Goad about doing his job.  Goad told Cannon that she was not going to put up with that. Cannon responded that Goad was a fine one to tell him what she was not going to put up with.  Cannon then went over, sat his desk and mumbling under his breath.  Goad reported this confrontation with Cannon to Joan Jeffreys and to Mike Thorpe.  To Goad's knowledge, Cannon received no discipline nor was any action taken against him.  (Goad Declaration, para. 6).

55.  During the period of time that Goad worked in the warehouse, she also worked with Mike Garner and Elvis Hallman.  From approximately 1999 to 2000, on several occasions, Garner and Hallman were rude to Goad, telling her to "shut up."  On several occasions Garner told Goad that he could not stand to hear her voice.  Goad reported this conduct to Mike Thorpe.  However, no action was taken regarding the conduct and comments from Garner and Hallman towards Goad and such conduct continued.  (Goad Declaration, para. 7).

## LACK OF INVESTIGATION

56.  Upon Whitten learning of the allegations of alleged prior misconduct against Rocha (as described in paragraphs 43, 45 and 46 of Defendant's Statement of Undisputed Facts), he nor anyone else with GE interviewed the employees to determine if the allegations were true. (Whitten Depo. P. 22, 44-46).

## ROCHA LEAVES ALBANY CLINIC

57.  Rocha left the Albany Clinic because Pellant was questioning him regarding his EEO charges and what legal action he may take against GE. Also because even after his release to return to

work with no restrictions, Pellant and others at the clinic continued to communicate with GE reagrding his treatment.  (Rocha Affidavit, para. 13).

58.  Pursuant to threat of termination by Jerry Whitten, Rocha did sign a release of information allowing Southern Counseling Services to provide information regarding his treatment to GE.  However, both releases were signed under protest.  (Defendant's Exhibits 24 and 25 to Vol. II of Rocha's Depo.).

59.  On March 19, 2002, Brenda Baird from Southern Counseling and Consultation Services, notified Rocha that since he was not mandated to treatment there, there was no further reason to send GE any type of treatment complete letter.  Further that Rocha had indicated to her that he had met his counseling goals and this his treatment was completed.  (Defendant's Exhibit 27 to Vol. II of Rocha's Depo.).


III.    ARGUMENT

A.     **GE is entitled to summary judgment on Plaintiff's gender discrimination claim.**

Plaintiff concedes that GE is entitled to summary judgment on Plaintiff's gender discrimination claim.

B.     **GE is entitled to summary judgment on Plaintiff's claims of perceived disability under the American with Disabilities Act.**

Plaintiff concedes that GE is entitled to summary judgment on Plaintiff's claims of perceived disability under the American with Disabilities Act.

C.     **GE is entitled to summary judgment on any possible discrimination claim under the ADA.**

Plaintiff concedes that GE is entitled to summary judgment on any possible perceived disability discrimination claims under the ADA.

**D.1.   Plaintiff is entitled to recover for violation of his rights pursuant to 42 U.S.C. Section 12112(d)(4).**

The Plaintiff is indeed asserting a claim for violation of his rights pursuant to 42 U.S.C. Section 12112(d)(4).  The Plaintiff admits that he is not a qualified individual with a disability under the Act, however, this is not a requirement in the Eleventh Circuit to bring this claim.  As GE noted at footnote 4, page 39 of its brief, this issue has not been decided by the Eleventh Circuit.  (See Roberts v. Rayonier, Inc., 2005 U.S. App. Lexis 11585, n.7 (11th Cir., June 2005).  GE also noted in footnote 4, page 39 of its brief, the Eight, Ninth and Tenth Circuits have decided this issue, finding that a non-disabled person under the Act, could bring a Section 12112(d) claim.  See Cossette v. Minnesota Power and Light, 188 F.3d 964 (8th Cir. 1999); Fredenburg v. Contra Costa County Department of Health Services, 172 F.3d 1176 (9th Cir. 1999); Griffin v. Steeltek, Inc., 160 F.3d 591 (10th Cir. 1998).  While the Fifth and Third Circuits have left the question open (see Fuzy v. S&B Engineers and Constructors, LTD., 332 F.3d 301 (5th Cir. 2003 and Tice v. Center Area Transportation Authority, 247 F.3d 506, 517 (3rd Cir. 2001).  The EEOC also supports the interpretation that a non-disabled person under the Act can bring an action under Section 12112(d).  See Armstrong v. Turner Industries, 141 F.3d 554, 558, 559 (5th Cir. 1998).

**2.      Plaintiff does have standing to sue for violations of 42 U.S.C. Section 12112(d).**

Contrary to the Defendant's assertion, Rocha does not simply allege a "technical" violation of the Act.  Rather, Rocha has alleged actual damages, this being mental and emotional anguish and distress as a result of the violation of the Act.  It undisputed that the range of damages and remedies available under the American with Disabilities Act are the same as those available under Title VII cases, as particularly designated and set forth in 42 U.S.C. Section 1981(a).  Under Section 1981(a), a plaintiff is entitled to recover compensatory damages which includes, but is not limited to, damages for mental and emotional distress and anguish.

Rocha has produced evidence in this action that, as a result of the violation of 42 U.S.C. 12112(d)(4), that he has suffered mental and emotional anguish.  More particularly, in paragraph 15 of Rocha's Affidavit he states:

> Mr. Whitten's threaten termination of my employ with GE if I did not provide full releases for General Electric regarding my psychiatric and psychological counseling and treatment at Southern Counseling Services, greatly exacerbated the stress, anxiety and depression that I was already suffering.  I am a very private person and do not easily share personal or family information with others.  To know that GE had access to my medical information regarding the problems I was having with my son's death and, in turn, to know that I was forced to provide this access in fear of losing my job, put me under a great deal of severe and emotional distress.

To accept the Defendant's argument would put Rocha in the untenable position of refusing the continuing mandatory EAP referral, which would have unquestionably resulted in his termination.  Thus Rocha was forced to pick either between his employment or to allow GE to continue to violate his privacy, in violation of the Act.  This argument is analogous to arguing that a female victim of quid pro quo sexual harassment under threat of termination for not exceeding to the sexual demands of her supervisor, would have no injuries if she agreed to the request in order to avoid termination.  This is simply an unsupportable position, both in fact and in law.  Given the sensitive nature of the problems for which Rocha was seeking treatment both before and after his mandatory EAP referral in August 2001, and the fact that he signed releases under protest, it is reasonable to conclude that Rocha did, in fact, suffer mental and emotional stress and anguish type damages as a result of GE's violation of the Act.

**3. GE is not entitled to summary judgment because the medical examinations and the inquiries were not job related nor were they consistent with a business necessity.**

Rocha asserts that implicit in the requirements that the medical exams and inquiries be job related and consistent with a business necessity, is the issue of good faith.  In other words that GE, in

determining that the medical examination and inquiries are job related and consistent with a business necessity, must make that determination in a reasonable and good faith manner.  This was wholly absent in the case at bar.

### a.      The initial mandatory EAP referral.

GE's determination that Rocha be mandatorily referred to its Employees Assistance Program was not reasonable nor done in good faith.  Much of GE's basis for making the mandatory referral was based on uncorroborated, if not contradicted hearsay allegations.  For example, when questioned about Rocha's invitation to "wrestle", Everett Waldrep laughed and said "that kid" referring to Rocha, was always trying to get him to wrestle.  Waldrep did not appear to be afraid nor intimidated by Rocha.  (Jeffreys Depo., p. 57-60).  Mark Walden told Jeffreys that he had no problems dealing with Rocha.  Rocha did not bother him, nor was Walden intimidated, threatened or afraid of Rocha.  (Jeffreys Depo., pp. 62, 69, 72).  When Jeffreys questioned Billy Turney regarding the allegation that Rocha had pushed him into a coke machine, Turney responded "don't worry about it, it's nothing, it's okay."  (Jeffreys Depo., pp. 69, 70).   The allegation regarding the confrontation between Renee Nowak and Rocha was also undisputedly false, as attested to by Jerry Waites.  (Waites Declaration, para. 3).

Further, GE's lack of good faith is further evidenced by its wholesale failure to investigate these allegations (Whitten Depo., pp. 22, 44-46), as well as the undisputed fact that Rocha was never questioned nor confronted about these allegations.

Further, the exception of the Mike Garner incident, all the alleged conduct considered to by GE against Rocha occurred prior to March 11, 1997, and as Joan Jeffreys testified, such conduct should not have been considered as it was over six months old.  (Jeffreys Depo., p. 146).

Rocha has denied such conduct and his denial was corroborated both by the above-identified employees, as well as by Goad and Waites in their Declarations.

28

As to the Mike Garner incident, Larry Cannon, a witness, was not interviewed by Whitten.  If he had been, Cannon would have related that both Rocha and Garner had "gotten in each others faces" and there was no physical confrontation.  (Cannon Depo., pp. 47-49).  Hallman verified Cannon's account of the incident.  (Hallman Depo., pp. 34-37).  Cannon never had a confrontation nor problem with Rocha, nor was afraid, threatened or intimidated by him.  (Cannon Depo., 45-55).  Ironically, Garner would appear to be, at least, as much at fault for the confrontation as Rocha, yet Garner received no mandatory referral to GE's Employees Assistance Program.

Further, GE was aware of confrontations that Cannon, Garner and Hallman had had with other employees.  Garner had had confrontations with co-employee Renee Seymor (Garner Depo., p. 43-44), and Terry Kellum.  (Garner Depo., pp. 45-54).  Doris Goad had confrontations with all three employees who had used vulgar, inappropriate language towards Mrs. Goad.  (Goad Declaration, paras. 6, 7).  However, in any of these confrontations, of which GE was aware, were Cannon, Garner and Hallman, ever given a mandatory EAP referral.  Further, this conduct was obviously not considered by GE in determining whether or not Rocha committed the misconduct as alleged in the incident with Mike Garner.  In fact, Whitten testified he wasn't interested in Rocha's side of the incident because all Rocha would do is deny it.  (Whitten Depo., p. 46).

Consequently, as a result of the above, at the very least, there is a dispute of a material issue of fact as to whether or not GE's determination that Rocha's mandatory EAP referral was reasonably and in good faith, job related and consistent with a business necessity.  As such, GE is not entitled to summary judgment on this issue.

**b.     GE's continued requirements of medical examination and inquiries.**

Even if this Court determines that Rocha's initial mandatory referral to GE's Employees Assistance Program was appropriate, GE's continued request for medical information from Rocha's health care providers and the forcing of Rocha to provide releases for such information or threat of termination, establishes a violation of the Act for which GE is not entitled to summary judgment.

It is undisputed that in July of 2000, shortly after the death of his son, Rocha began seeking and receiving treatment at the Albany Clinic for depression and anxiety.  (Plaintiff's Evidentiary Submission 1; Defendant's Exhibit No. 1 to Pellant Depo.).  Contrary to Whitten's assertion, Whitten was aware that during this time frame, Rocha was having personal issues and was also aware that Rocha was seeking and receiving treatment from the Albany Clinic during this same time period.  (Defendant's Evidentiary Submission, Tab 2).  In conjunction with this treatment, Dr. Love was prescribing and managing medications for Rocha (Rocha's Depo., p. 75; Defendant's Exhibit 2 to Pellant Depo.), and Rocha was keeping regularly scheduled appointments.  (Pellant Depo., p. 52; Plaintiff's Exhibit 1 to Pellant Depo.).

Whitten informed Rocha that when Rocha was released by the Albany Clinic, Rocha would no longer be required to go to the clinic for treatment.  (Hamilton Depo., p. 47; Whitten Depo., p. 91; Plaintiff's Exhibit 13 to Hamilton Depo.).

On September 4, 2001, the Albany Clinic had released Rocha to return to work with no restrictions and further informed GE that Rocha did not pose a threat of violence or harm or safety to anyone at GE.  (Whitten Depo., p. 82).

GE now claims that even Rocha had been released to return to work, that GE required Rocha to continue his regularly scheduled appointments with the Albany Clinic, as well as continue his medication management through the clinic as a condition of his continued employment.  However, GE

can produce no documentation to support this (Whitten Depo., p. 95-97), and Rocha denies he was told this as well.  (Rocha Affidavit, para. 12).

Simply, once Rocha was released to return to work with no restrictions, with no threat of safety or harm to anyone at GE, then any possible reasonable good faith basis for GE to continue require Rocha to seek medical treatment and GE's inquiries into such treatment ended.  Such examinations and inquiries at that point were not job related and were not consistent with any business necessity on behalf of GE.  Thus GE's further requirements of psychiatric, psychological treatment and inquiries into the same, violated Rocha's rights under the Act.

There is additional evidence to support Rocha's contention that his visits to the Albany Clinic after September 4, 2001, were not related to any mandatory referral from GE.  First, a review of Pellant's notes after September 4, 2001, nowhere indicate that her treatment is based on a mandatory EAP referral.  It is undisputed Pellant was treating Rocha for his grief prior to the mandatory referral.  A review of the treatment plan review by Pellant of September 20, 2001, was almost identical to her treatment plan review of July 31, 2001.  Her note of September 20, 2001, mentions nothing regarding conflicts at work, nor mandatory EAP referrals from GE.  Further, a review of Rocha's Evidentiary Submissions 6 and 7, indicate that at these visits with Pellant at the Albany Clinic on September 6 and September 20, that Rocha provided a $15.00 co-pay on each of these two visits.  Rocha would assert that if these visits were covered under a mandatory EAP referral, that he would not have been required to make a co-pay.  However, if these visits were covered for his personal issues, the co-pay would be required.

Rocha left the Albany Clinic because Pellant was questioning him regarding his EEO charges and what legal action he may take against GE. Also because even after his release to return to work with

no restrictions, Pellant and others at the clinic continued to communicate with GE regarding his treatment.  (Rocha Affidavit, para. 13).

Upon being informed that Rocha had left the Albany Clinic, Rocha was accosted by Jerry Whitten, who demanded to know the new psychiatrist/psychologist/counselor that Rocha was seeing and further demanded that Rocha sign a release of information, allowing GE to obtain information regarding his treatment.  Whitten threatened Rocha's employment if he did not immediately acquiesce to Whitten's demands.   Under protest, Rocha did so.   Thereafter, Larry Hamilton on November 9, 2001, corresponded with Brenda Baird, Rocha's new counselor at Southern Counseling and Consultation Services requested "dates and times of Rocha's visits, subject matters covered and your diagnosis/assessment" of Rocha in writing.  This is much broader than GE's assertion that they wanted to know the issues regarding harassment, intimidation and those situations.  Hamilton admitted that they could have simply put those in a letter to Baird but did not do so.

Particularly disturbing is the evidence regarding the motivation of Cannon, Garner and Hallman, in making false accusations against Rocha.  As Doris Goad related very shortly after Rocha's wife became pregnant and Rocha learned the baby was very ill and likely not to survive after being born, Rocha was off work a good deal, both before and after the baby was born and died.  Garner, Cannon and to a lesser extent, Hallman, were all very critical of Rocha because of the time off he was taking from work and felt that Rochas should have aborted the baby.  (Goad Declaration, para. 4).

This conduct by GE was no way related to Rocha's job nor consistent of any kind of business necessity. Thus, GE motion for summary judgment on this issue is due to be denied.

  **E.**  **GE is entitled to summary judgment on Plaintiff's retaliation claim regarding his workmen's compensation benefits.**

Plaintiff concedes that GE is entitled to summary judgment on his retaliation claim regarding his workers compensation benefits.

**IV.      CONCLUSION**

For the foregoing reasons stated above the General Electric's Motion for Summary Judgment should be denied.

Respectfully Submitted,


/s/ JAMES M. WOOTEN
Attorney for the Plaintiff
Suite 910
2001 Park Place North
Birmingham, Alabama 35203
(205) 322-7707


CERTIFICATE OF SERVICE

I do hereby certify that I have served a copy of the foregoing pleading upon James Pennington, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., 1 Federal Place, Suite 1000, 1819 5th Avenue North, Birmingham, AL, 35203, by electronic filing, this 29th day of July, 2005.


/s/ JAMES M. WOOTEN