FILED
2006 Mar-31  PM 05:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
<u>NORTHEASTERN DIVISION</u>

| | | |
|---|---|---|
| TIMOTHY ROCHA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 03-PWG-0071-NE |
| | ) | |
| GENERAL ELECTRIC COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

<u>MEMORANDUM OF DECISION</u>

Timothy Rocha (Rocha), plaintiff, initiated this action against his employer, General Electric Company (GE), defendant, alleging gender discrimination and retaliation in violation of Title VII, 42 U.S.C. § 2000(e),  et seq. (Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991) and a violation of 42 U.S.C. § 12101, et seq. (Americans with Disabilities Act).  In its brief in support of the motion for summary judgment GE addressed all claims raised by Rocha.  In his response to the motion for summary judgment, Rocha concedes that defendants are entitled to summary judgment on all claims but for an alleged violation of 42 U.S.C. § 12112(d)(4) for GE "illegally requiring Rocha to submit to continuous medical exams and inquiries that were not related to his employment with GE nor consistent with an business necessity of GE's." (Plaintiff's response to defendant's motion for summary judgment, p. 4).   Because Rocha asserts only the claim for violation of § 12112(d)(4), all other claims have been abandoned. *Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1325 (11th Cir. 2000).  This court has jurisdiction pursuant to 28 U.S.C. § 1331, federal question.  The parties have consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. § 636(c) and LR 73.2. This matter is before the Court for consideration of Defendant's Motion for Summary Judgment (doc. #40).

<u>STANDARD OF REVIEW</u>

Summary judgment is appropriate only if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Rule 56, *Federal Rules of Civil Procedure*.  In making that assessment, the Court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  The burden of proof is upon the moving party to establish a *prima facie* entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991).  Once that initial burden has been satisfied, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989).  Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issue of fact become immaterial and the moving party is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990).  As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a *prima facie* case.  "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial."  [Citation omitted].  Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof.  This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett*, 898 F.2d at 1532.

The following relevant facts are undisputed or, if disputed, viewed in the light most favorable to plaintiff, the nonmoving party.[1]

Joan Jeffreys became the GE Warehouse manager in July of 1996.  (Jeffreys depo., p.13). Mike Thorpe is the Business Team Leader over the second shift in the warehouse.  (Jeffreys depo., pp.17-18).  Because Thorpe spends 80 percent of his time on second shift in the plant rather than the warehouse, second shift warehouse employees are expected to work without direct supervision. (Jeffreys depo., p. 18).

Between 2000 to 2002, both before and after the incident between Rocha and Mike Garner discussed below, GE employee Everett Waldrep told Jeffreys that Rocha repeatedly tried to get him to go outside and wrestle.  (Jeffreys depo., pp.58-60).  Jeffreys testified that Rocha also allegedly approached Mike Garner, Larry Cannon and Mark Walden to wrestle.  (Jeffreys depo., p. 65).

Another employee, Kenny Kirby, told Jeffreys that he would sometimes take products into a rail car, and Rocha would pull over in front of the ramp so Kirby could not get out, then Rocha would act as if he was doing paperwork.  Kirby said he did not ask Rocha to move because he did not want to "get into it" with Rocha.  (Jeffreys depo., pp.60-61).  Waldrep told Jeffreys that he had witnessed Rocha block Kirby in a rail car.  Waldrep also told Jeffreys that Rocha followed him [Waldrep] too closely in the forklift, and that Rocha had also blocked another employee, Mark Walden, in a rail car.  (Jeffreys depo., p. 104).  Occasionally, two forklift operators work as a team in loading refrigerators onto a rail car and one of the two team members might stop the forklift at the bottom of the ramp to the rail car to complete some paperwork while the other member of the team is in the rail car loading refrigerators.  (Declaration of Doris Goad, ¶ 5; Declaration of Jerry Waites,

---

[1]Any facts that would have supported only  the now abandoned claims are no longer relevant to this court's analysis of the remaining claim.

¶ 5).  However, Jeffreys has never received complaints that any employee other than Rocha has blocked employees in a boxcar.  (Jeffreys depo., p. 113).

Larry Cannon told Jeffreys that Rocha asked him to meet him somewhere off site so they could fight.  (Jeffreys depo., p. 66).  Cannon told Jeffreys that she did not need to worry about it, and that he could handle it.  (Jeffreys depo., p. 67).  Several employees told Jeffreys that Rocha had grabbed another employee, Billy Turney, and pushed him up against a Coke machine.  (Jeffreys depo., pp.69-70).  Jeffreys questioned Turney about the incident and he replied "It was nothing, it's okay, don't worry about it."  (Jeffreys depo., pp.69-70).  Turney also told her "Joan, I don't want any problems."  (Jeffreys depo., p. 71).

In 1996 Renae Nowak told Jeffreys that she had reported that Rocha was away from his workstation excessively, that Rocha had learned that she had reported him, and that he badgered her with: "I know you're the one who told and I'm going to – her words were, kick your ass, and then later on, it was, I want you to meet my wife after work.  She can't understand why someone would treat her baby this way, she wants to kick your ass."  (Jeffreys depo., pp.73-74).  While Jeffreys believed the report of Nowak and such conduct would be grounds for immediate termination, she did not take action because she was told a year or two after the occurrence, and Nowak did not want anything to be done.  (Jeffreys depo., pp.77-78).

On March 11, 1997 Jeffreys referred Rocha to GE's Employee Assistance Program provider, i.e., the Albany Clinic, based upon the allegations of confrontational behavior with his co-workers.  (Jeffreys depo., pp.93,100; Plaintiff's exhibit 1 to Jeffreys depo.).  The written reminder of March 11, 1997, that Jeffreys gave to Rocha (Plaintiff's Exhibit 1 to Jeffreys depo.), would only stay active for six months according to company policy.  (Jeffreys depo., p.146).  In 1997 the clinic noted the reported problems to be "a one time assessment for unmanageable temper, alcohol abuse, frustration

problems." The clinic also noted that Rocha suffered from an occupational problem of arguing with supervisor (Plaintiff's Exhibit 2 to Jeffreys depo.).

In a progress note dated March 25, 1997 Michael Phillips, Rocha's counselor, wrote:

> I received a call from Joan Jeffers [sic], Tim's supervisor, concerning Tim's behavior while at work. I did not disclose any information to her concerning our assessment. I requested from her unofficial documentation as to more information about Tim's behaviors on the job, explaining that the information on the referral was rather vague. She stated that she would consult with Linda Brooks and would let me know.
>
> I received the call from Ms. Brooks and explained my position and inability at this time to see their point of view. She understood and said that she would consult with their legal counsel and get back with me. They, of course think the situation is more serious and will try to comply.

(Plaintiff's evidentiary submission 3).

On March 13, 1997 Rocha filed a grievance against Jeffreys, claiming harassment, false accusations, "defamation" of character, favoritism, double standard policy and threats. (Plaintiff's Exhibit 3 to Jeffreys depo).

Mike Thorpe was Rocha's business team leader from 1997 until Rocha was transferred to a different department in approximately August of 2001. (Thorpe depo., p.16). In Thorpe's opinion, Rocha did a great job and was very willing to do anything that came up that needed to be done and never complained. (Thorpe depo., pp.17-18; see also Waites declaration, ¶ 6). Thorpe never observed any confrontational behavior of Rocha. (Thorpe depo., p. 19).

After August 2001 Thorpe heard a "rumor" that Rocha had shoved Billy Turney into a corner by a drinking fountain. Thorpe also heard of an alleged incident involving Rocha and Renee Nowak prior to Thorpe coming into the warehouse. Thorpe also heard of a rumor that Mark Walden and Rocha had some "scuffling matches." (Thorpe depo., pp.24-27). In his initial deposition Thorpe

was specifically asked if he received any other complaints after the Mike Garner incident and Thorpe responded "no and, like I said all those are rumors." (Thorpe depo., p. 36).

In his second deposition given approximately one week later, Thorpe related a conversation he had with Garner where Garner complained that Rocha had followed him on his motorcycle and another conversation with Elvis Hallman where Hallman complained that he saw Rocha at the end of his street on a motorcycle. (Thorpe second depo., p. 7).

After the confrontation between Rocha and Garner in 2001, Linda Mahaffey reported to Jeffreys that two or three years earlier, Rocha had challenged her to a fight. Also, after the confrontation between Rocha and Garner, Joan McKelvy reported to Jeffreys that 10 to 12 years earlier she and Rocha had a problem with each other while working on the assembly line. Rocha was walking down an aisle, came up to her, got in her face and said "do you remember back on the case line when you did that" and pointed his finger at her. McKelvy asked Rocha what he was talking about and Rocha said "I remember and I haven't forgotten it." (Jeffreys depo., pp.85-86).

In approximately April of 2000 Rocha began to seek medical treatment from Dr. Love at the Albany Clinic concerning pre-grievance as to the death of his son. (Rocha depo., p.75). Rocha and his wife had discovered in the third month of his wife's pregnancy, that being March of 2000, that his son would not survive the birthing process. (Rocha depo., pp.75-78). Rocha continued to seek counseling from the Albany Clinic. (Plaintiff's evidentiary submissions 4 and 5; Rocha depo., pp.74-75, 81; Rocha affidavit, ¶ 11). Rocha felt provoked or harassed at work because of his religious beliefs by Garner, Cannon and Hallman who expressed profanity and vulgarities toward Rocha. Garner would curse Rocha, using vulgar names such as God damn, shit and MF. (Rocha depo.,pp.89-94). Rocha specifically complained about the August 22, 2001 incident involving Garner yelling at him, cussing him and telling him to get his paperwork into the office. (Rocha

depo., pp.94,96).  Cannon, in the context of discussing religious denominations asked Rocha what he was and Rocha said "I'm Catholic converted to the Church of Christ.  He told me he goes to a non-denominational church.  That's all I can remember of that conversation." (Rocha depo., pp.102-103).  On one occasion between 1999 and 2002, Hallman called Rocha a "Bible Thumper."  (Rocha depo., pp.104-105).  Rocha complained about this to his supervisor Mike Thorpe and asked if there was anything Thorpe could do and Thorpe said no.  (Rocha depo., p.97).  Rocha testified that he could have filed a grievance against Garner, Cannon and Hallman but did not and no one at GE prevented him from doing so.  (Rocha depo., p.98).

On August 16, 2001 Rocha saw a psychiatrist, Dr. Edward Love, at the Mental Health Center of North Alabama.  Rocha reported that he was continuing to have problems with grief over the death of his son.  Dr. Love recorded that Rocha "recently had noticed some increased irritability," and that Rocha "has lost his temper and feels provoked at work because of his religious beliefs." (Pellant depo. Def. Exh. 2).  In deposition Rocha was asked about his August 16, 2001 report that he had lost his temper at work:

Q:      What was the occasion when you had lost your temper at work that you related to Dr. Love on August 16, 2001?

A:      I don't remember.

Q:      Who did you lose your temper with?

A:      I don't believe it was anyone.  It was just the job getting everything done, chop, chop, Not so much being angry at someone, just being inside, built inside.  I wouldn't vent it on no one, if that's what you mean.

Q:      So you secretly lost your temper.

A:      No.  I would just – I would get upset if I couldn't find this refrigerator somewhere. I would be going oh, man, you know, and I knew that wasn't me.  I wouldn't react to things like that usually.  I just knew it was what I was going through at the time.

Q:      Describe what you mean by lost your temper?

A:      I don't remember losing my temper at work, being irate or anything.  Frustrated maybe, aggravated, trying to get my orders done or something.  That's all I can think of.

Q:      So you're not sure what you were talking about when you told Dr. Love that you lost your temper at work?

MR. WOOTEN:      Object to the form.

A:      I don't remember.

(Rocha depo., vol. I, pp.107-09).

On August 22, 2001, six days after reporting to Dr. Love that he had lost his temper and felt provoked at work, Rocha had a "confrontation with Mike Garner, a co-employee, who yelled and cursed Rocha."  (Complaint ¶ 15).  Garner reported the incident to his supervisor, Mike Thorpe.  In deposition, Garner described the incident as follows:

> I was standing in the office with Larry Cannon.  He runs the office, does the paperwork and does the bills.  And Larry needed Tim to turn in some paperwork.  Tim had came by the office, and Larry had seen him.  And Tim got off his truck, and he was about halfway in between the males' bathroom and the break room, which would probably be approximately 35, 40 feet from the office door, I guess.  Larry asked me, he said, Mike, holler at Tim.  Tell him I need his paperwork, to come here.
>
> I stuck my head out the door.  I said, hey, Tim, in just about that tone of voice, and he just kept walking.  And so I said, hey, Tim – maybe just a tad louder – Larry needs you in the office.  That's all I said.  I turned back around.  I walked back in the office standing at the corner of the counter in the office, and he came in and got real defensive, bumped into me and told me, don't you ever be hollering at me.  I said, Tim, I wasn't hollering at you.  I was trying to get your attention that Larry needed you.  And from that point on, it got pretty nasty.  It got real nasty, as a matter of fact.  He reached and grabbed me.  He tried to intimidate me, there again, his size.  There again, he did not intimidate me.  I did not back off.  I stood my ground, and me and him had words.  To say every word that we said to each other, no, I don't remember them other than I told him, Tim, you need some help.

8

And I probably told him that two or three times. I'm not a psychiatrist. I'm not a doctor, but I'm a hardworking man that's lived and can see what's going on, and the man needed some help at that time. He had crossed the line with me as far as employee to employee. There was no sense in what he had done.

(Garner depo., pp.37,31-33).

Garner reported to Thorpe that Rocha grabbed his shirt to the point of snapping a button off his shirt (Garner depo., pp.37,34) and that Rocha told Garner "We can take care of this over at Wally World [a convenience store across from the plant] after work." (Garner depo., pp.37,35).

In deposition Rocha identified notes he made the night or day after the incident which described the incident. According to the notes, on August 22, 2001 at approximately 11:00 p.m. Rocha had pulled up in front of the warehouse office on his forklift truck and was getting his paperwork from his clipboard. As Rocha walked towards the office, Garner looked directly at him, about three steps away, and proceeded to yell directly into his face, telling him to get his God damn paperwork into the office. Rocha then asked Garner why he was yelling and cursing, and Garner responded so you can get your paperwork to Larry Cannon. Garner told Rocha that he was "not right." Rocha replied "pardon me?" Garner yelled "you're not right." Rocha replied to Garner "who are you to judge me?" Garner again said to Rocha "you're not right." Rocha replied to Garner "you're the one that's been married five times." Garner then said "let's go to Wally World." Rocha did not reply. Garner left the office. Rocha did not curse Garner nor did he bump him intentionally. Rocha does admit that he accidentally bumped Garner who was in front of the door as Rocha was coming in. Rocha did not grab Garner's shirt nor did he invite Garner to "go to Wally World." (Rocha depo., vol. II, pp.53-60; Defendant's Exhibit 9 to vol. II of Rocha's depo.).

Prior to the confrontation with Rocha, Garner had "confrontations" with two other GE employees. (Garner depo., p.43). Garner described the confrontation with Renee Seymore in the following manner:

A:     Renee was having a lot of problems, and she had – was sitting in the break room, and I come through. And she was sitting there to the point of crying nearly, and I said, Renee, what's the matter. And she said that I'm not needed. My husband don't need me. My children don't need me. My son don't need me. My coworkers don't need me.

       And I said, Renee, I said, snap out of it, you're needed. I said, God did not create junk. I said, so God put you here for a reason. And she was just on and on in the same way, and I made some remarks that I regret today that I made that was uncalled for.

Q:     What did you say?

A:     I said, Renee, I said, you know, you're here for a reason. God put you here for a reason. If not, I said, why don't you just take a gun and blow your brains out. I said, you know, I mean, if life is this miserable to you – and, there again, I knew I had made the wrong statement as soon as I made it, but I was trying to snap her out of the mode she was in. I was wrong. I was corrected.

Q:     Well, did she go complain to somebody about that comment?

A:     Yes, I'm sure she did.

Q:     Did somebody from management come down and talk to you about it?

A:     Yes, they did.

Q:     Who was that?

A:     Mr. Jerry Witten.

Q:     Tell me the conversation you and Mr. Witten had.

A:     Mr. Jerry Witten told me he appreciated that I was concerned about her, but I had chosen the wrong words to say and to please not do that no more, that it was not necessary for me to make statements like that.

Q:     Was that the end of it?"

A:     Pretty much.  You know, I explained – I apologized, and, you know, a lot of times you say something, you regret saying, but it's already said.  But GE, like I said, we are a family. They took care of Renee, and they took care of me.  The corrected me on the choice of words that I used and to not use them no more.

(Garner depo., pp.43-45).

In the mid-90's Garner had a confrontation with Terry Kellum, A GE employee who had had an affair with Garner's wife, also a GE employee, prior to Garner marrying her.  Kellum would show up in Garner's wife's work area or call her at work.  Employees were coming to Garner unsolicited and informing him of this.  (Garner depo., pp.45-49).

On two occasions, Garner told Kellums to stay away from his wife:

Q:     On the first occasion, tell me exactly what you and he said.

A:     The first occasion I told him, I said, Terry, look, just stay away from Janice.  You need to go have your life with your wife and get it straightened out.  You have got a wife.  You have got a family.  You need to go home.  Leave us alone.

Q:     And then obviously he didn't do that because you had the second conversation?

A:     That's correct.

. . . .

Q:     So the second time you went to speak with him, what happened?

A:     The second time it wasn't even on GE property.

Q:     The first time was?

A:     Right.

Q:     The second time, what happened?

A:     The second time he had convinced her to get in the car and go with him to talk, and I caught them in the car together.

. . . .

Q:     Tell me what happened.  Did you go up to their car?

11

A:      Oh, yes.

Q:      Tell me what happened when you got up there.

A:      I told him again, Terry, leave this alone.  You know, you are married.  You know, supposedly you're supposed to be a Christian man is what you say.  He was a deacon at a church.  This is not deacon material what you're going through right here.  You need to back off and leave it alone.  I do not believe in affairs today, tomorrow or any other time.  You need to get a little bit of that in your dadgum life.

Q:      What did he say?

A:      He said okay, you know, pretty much.  You know, he didn't have a whole lot to say.  I mean, he was caught, so he didn't have a whole lot of words to say.

Q:      Was that the end of the conversation?

A:      Yes, it was.

Q:      Now, in either one of these conversations, did you curse him?

A:      Probably so.

                                . . . .

Q:      Both conversations you cursed him?

A:      Probably just the one off the property.

                                . . . .

Q:      Did you threaten him in any way?

A:      No.

Q:      Directly or indirectly?

A:      No.

(Garner depo., pp.49-52).

Garner was not reprimanded when he cursed Doris Goad in October of 2001 when at the direction of Thorpe she went to the warehouse office to assist in paperwork.(Goad dec.; ¶ 6).  Also,

12

Garner was not reprimanded when he told Goad on several occasions to "shut up" and that he could not to stand to hear her voice.  (Goad dec., ¶ 7).  Hallman was not reprimanded for telling Goad on several occasions to shut up.  (Goad dec., ¶ 7).  Goad reported these instances of rude behavior to Jeffreys and/or Thorpe.

On August 24, 2001 Hallman approached Thorpe and told him he wanted to transfer out of the warehouse.  When Thorpe asked why, Hallman told Thorpe that there was an "incident" between Garner and Rocha.  (Thorpe depo., p.49).  Hallman told Thorpe essentially the same story as Garner except that he did not report that Rocha bumped into Garner, but that they were bumping each other, and he did not report Rocha grabbing Garner.  (Hallman depo., pp.36-37).  Hallman believed that Garner was scared of Rocha because of the way Garner looked and acted, and because Garner told him he was scared of Rocha.  (Hallman depo., p.50).  Hallman told Thorpe that Rocha intimidated him.  (Hallman depo., p.38).  Hallman also told Thorpe that no one wanted to speak up about Rocha (Hallman depo., pp.38-39) because of fear that Hallman might receive some "negative repercussions," meaning that Rocha "might confront me and we would be in a physical confrontation." (Hallman depo., 57).  Hallman told Thorpe he was leaving the warehouse and going back to his old job in the plant because of his concerns about Rocha.  (Hallman depo., p.63).

Thorpe called Jeffreys and told her about the incident between Rocha and Garner.  (Jeffreys depo., pp. 125-126).  Thorpe told Jeffreys that Garner, Hallman and Cannon were not comfortable coming back into the warehouse to work with Rocha.  (Jeffreys depo., pp.125-126).  Jeffreys was particularly concerned about the situation because the warehouse is a department where people are expected to work as a team and work without supervision.  (Jeffreys depo., p. 132).

Jeffreys and Thorpe brought the August 2001 incident between Rocha and Garner to the attention of Jerry Witten, GE's Human Resources Manager, who then met with Garner and Elvis

Hallman. (Witten depo., pp.24-26). Garner told Witten that Rocha was threatening and intimidating employees, that Rocha had bumped up against Garner with his chest, knocked Garner against the wall and grabbed Garner by his shirt. (Witten depo., pp.27-28). Garner said employees were threatened and intimidated, and some employees did not want to come to work. (Witten depo., pp.27-28). He told Witten that Rocha had trapped Elvis Hallman in a railcar. (Witten depo., p.28). He also mentioned that Rocha "slammed" Billy Turney up against a coke machine and that Rocha stares at people and looks at them very threateningly. (Witten depo., pp.28-29). In the meeting with Hallman and Garner, Witten was told that Rocha was telling people he wanted to go outside and "scrummage" with them and inviting people off the premises to settle their differences with him. (Witten depo., p.29). Witten was also told that employees were afraid to mention anything to management because they were afraid that if they complained, Rocha might do something to them. (Witten depo., pp.29-20). In the meeting, Hallman said he was afraid of Rocha. (Witten depo., p.38). While Garner said he was not personally afraid of Rocha, Witten read his body language differently. (Witten depo., p.38).

Witten also was told in that conversation that Renae Nowak had a problem with Rocha, that Rocha probably would not do anything to her, but he would "get his wife to kick Ms. Renae's ass." (Witten depo., pp.43-44). Witten was told that Rocha stares at everyone and gives them dirty looks, except management people. (Witten depo., p.44). Witten believed what he heard from Garner and Hallman because "seeing the look on their face and the tremble in their voice and the fear [he] definitely didn't think they were lying." (Witten depo., p.46). Based on Jeffreys' statement that Rocha's "not going to admit anything and it's going to be – he didn't do anything," Witten assumed that Rocha would deny the conduct. Subsequent to Witten's referral, Rocha did in fact tell Witten he did not do anything. (Witten depo., pp.46-47).

14

While Rocha admits that he bumped Garner, he explains that it was only because Garner was standing in the doorway.  (Rocha depo., vol.II, pp.58-59).  He does not remember what part of Garner's body he bumped.  (Rocha depo., vol.II, pp.58-59).  Even if Rocha believed he had been provoked by hearing the word "Goddamn," Witten would not have expected a reaction like Rocha's behavior described by his co-employees: "[W]e have a lot of very religious people in our plant, more than I have ever seen in a plant, but we also have those who probably take the Lord's name in vain, and I don't recall any in my eight years any kind of confrontation as a result of some very strong Christian hearing that in the workplace."  (Witten depo., pp.47-48).

Witten, in consultation with Thorpe and Jeffreys, made the decision to move Rocha from the warehouse to a position on the assembly line which is a more supervised area.  (Witten depo., pp.10-11).  Witten also decided to send Rocha to GE's Employee Assistance Plan provider "to deal with the behaviors that we had identified that were unacceptable," including "threatening, intimidating behavior, chesting somebody against the wall, grabbing them by their shirt, [and] trapping them on a railcar."  (Witten depo., p.62).  Jeffreys gave Rocha a memorandum on August 29, 2001 which informed Rocha that "we feel it is appropriate to remove you from your job in the warehouse and put you on a job in the factory.  This action is based on the confrontational behavior you have displayed.  We feel a structured environment will be an asset to you."  (Jeffreys depo., pp.148-149, Pl. Exh. 6).  The memorandum informed Rocha that he was being suspended until an evaluation could be given through "our EAP, the Albany Clinic," and that his return to work "will be determined by their screening process."  (Jeffreys depo., Pl. Exh. 6).  The August 29, 2001 memorandum to Rocha goes on to state as follows:

> **This is a management referral and requires that you comply with their recommendations.   Failure to comply will result in termination.**

15

(Jeffreys depo., Pl. Exh.6).

Rocha admits that he was informed that following the recommendations of the Albany Clinic was a condition of his employment.  (Rocha depo., vol.I, p.286).

Mike Garner is about 5'9" and weighs 170 pounds.  (Garner depo., p.29).  Elvis Hallman is about 5'6" and weighs slightly over 150 or 160 pounds.  (Rocha depo., vol.I., p.7).  Billy Turney is about 5'6" and weighs less than 175 pounds.  (Rocha depo., vol.II, p.8).  Renae Nowak is about 5'7" and weighs 130 pounds.  (Rocha depo., vol.II, p.7).  Rocha is 6'4" and weighs 286 pounds.  (Rocha depo., vol.II, pp.6-7).

Rocha's counselor, in her professional opinion, believes that an employer would have a reasonable concern for the safety and health of its employees if one employee asked another employee to go outside and wrestle with him, grabbed another employee by the shirt while arguing and/or trapped another employee in a rail boxcar with a forklift.  (Pellant depo., pp.81-82).  The Albany Clinic, GE's Employee Assistance Program ("EAP") counseling provider sometimes received mandatory management referral of employees from GE.  (Pellant depo., p.19). Management referrals generally involved work-related issues such as low productivity, absenteeism, inappropriate behavior with co-workers or suspected substance abuse.  (Pellant depo., pp.19-20).  EAP counseling also helps employees deal with personal issues such as stress, grief or family problems so those issues do not affect work productivity.  (Pellant depo., p.14).

The counseling clinician, not GE, determines when the management referral ends.  (Pellant depo., p.36; Hamilton depo., p.43).  In the view of GE's human resources department, "It ends when the counselor or whoever is handling the case says, hey, the case is closed, an employee may come back to work, may continue work and not be under our supervision or case or whatever." (Hamilton depo., p.24).  The clinician determines whether to end the management referral to the EAP based on

these criteria: "evaluation of the mental health status of that employee, his participation and compliance with recommendations such as the scheduled appointments and medication, his behavior, his functioning, and above all, his reported functioning on his job. (Pellant depo., p.36). On August 30, 2001, Linda Brooks, a GE Human Resources employee , sent a memo which was received by Tamara Pellant, a counselor at the Albany Clinic, referring Rocha to the clinic under the EAP.  The memo established the following conditions of the management referral:

> He is to follow any treatment plan that is prescribed by you or your doctor.  This is a condition of continued employment.
>
> He cannot return to work at GE until he has been evaluated and it has been determined by your mental health professionals that it is safe for him to be in our work environment.
>
> He is to sign releases allowing you to communicate with us on the status of his condition and any prescribed treatment plan.

(Pellant depo., pp.42,72, Pl. Exh.2).

Pellant testified that she believed that one year after the death of his child Rocha was still upset and vulnerable and that he overreacted to conduct at work that offended him.  Her professional opinion was that his personal problems affected his ability to work.  (Pellant depo., p.83).

> Q:   Well, you're saying that the issues that he was receiving counseling for prior to the EAP program affected his ability to get along with his co-employees, and my question is, give me a specific example of how those issues affected his ability.  Tell me what issue he had with a co-employee that's connected to his grief or his bereavement or his wife's infertility.
>
> A:   My recollection is that Mr. Rocha, because of his beliefs, his moral values, had a very difficult time to tolerate certain language, language that was vulgar.  When he was – when a person has a difficult with a certain issue, and in addition to that they are already vulnerable and upset, they might overreact.  And I think that's what happened when Mr. Rocha overreacted to a coworker's comments because he was already upset in his own right.
>
> Q:   Well, what was he upset about on this particular occasion where he overacted to a coworker's comments?

A:      About several issues: the anniversary of the death of his child – that was very, very
        painful to him – and his wife's struggles with infertility, which is a very, very painful
        issue.

Counselor Pellant's assessment was that Rocha could return to work "with the condition that he

would continue in counseling dealing with his emotional issues of grief, and that he will also

continue to see Dr. Love for medication management."  (Pellant depo., pp.47-48).  Alabama law

requires a return-to-work recommendation to come from a doctoral-level counselor; (Pellant depo.,

p.55), therefore, Pellant made her recommendation to Dr. Love, a psychiatrist, who agreed with the

recommendation that Rocha return to work conditioned upon his continued counseling.  (Pellant

depo., p.55, Pl. Exh. 6).  Pellant communicated her recommendations (and the approval of Dr. Love)

to Linda Brooks at GE by telephone on August 30, 2001.  (Pellant depo., pp.54-55,79-80, Pl. Ech.4).

The letter that Pellant sent Brooks reads as follows:

> This is to confirm that I have met with Tim Rocha on 8/30/2001 and
> 98/6/2001 following a management referral.
>
> During assessment, Mr. Rocha was calm and cooperative.  His affect
> was appropriate.  He acknowledged "losing his temper with a
> coworker," but stated he was provoked by the co-worker who
> allegedly used vulgar language.  I have staffed Mr. Rocha's case with
> Dr. Ed Love, his attending psychiatrist, who recommended Mr. Rocha
> return to work.
>
> I concur with the recommendation for Mr. Rocha to return to work
> and **further recommend for him to continue treatment at the
> Albany Clinic, keeping regularly scheduled appointments for
> counseling and medication management**.

(Pellant depo., pp.59-61, Pl.Exh.6).  (emphasis added).

Pellant discussed the conditions of Rocha's return to work with Rocha and documented in

a progress note that he "had good understanding of the recommendations made for return to work,

need to comply with prescribed meds, and scheduled appts." (Pellant depo., pp.74-75, Pl. Exh. 3). Rocha signed the progress note. (Pellant depo., p.74, Pl. Exh. 3).

Rocha contends that it is clear from Pellant's letter to Linda Brooks of September 6, 2001 that Pellant, not Dr. Love, recommended Rocha continue his treatment at the Albany Clinic, keeping regularly scheduled appointments for counseling, and medication management. (Plaintiff's Exhibit 6 to Pellant Depo.; Witten depo., p. 84).

Rocha maintains that the reference to "prescribed meds, and scheduled appts" referred not to a continuation of the mandatory management referral but, rather, to the voluntary counseling concerning the death of his son that he had started before the mandatory management referral. In connection with this counseling, Dr. Love had prescribed several medicines including Paxil. Rocha cites as evidence for this position the fact that Pellant's treatment plan of September 20, 2001 makes no mention of any mandatory referral from GE; nor no mention of Rocha's return to work with restrictions. (Plaintiff's Exhibit 1 to Plaintiff's Depo).

In Pellant's professional judgment as a licensed professional counselor, Rocha understood that his return to work was conditioned upon his compliance with prescribed medications and keeping scheduled appointments. (Pellant depo., p.75). Rocha was returned to work without restrictions. Witten testified that he understood "without restrictions" to mean that "you don't – you don't have to handle him, treat him any different than any other employee, but that "he needed to continue his prescribed treatment that they said that they wanted him to go through to be able to continue to deal appropriately with the issues that we had surfaced that he needed to deal with." (Witten depo., pp.81-22). Witten further testified that he understood Albany's recommendation to mean that Rocha was safe to return to the workplace, but "he's got some problems, he's got some issues that y'all [GE] identified that need to fixed, but we [Albany] think based on our discussion,

he can come back to work, but we're still going to work with him trying to fix those issues." (Witten depo., p.87).

On September 4, 2001, Witten stated in a memorandum to Rocha that "You received a management referral to Albany Clinic and they have returned you to work with no restrictions." (Exhibit 24 to Witten Depo.)  The conditions placed on Rocha's return to work – "keeping regularly scheduled appointments for counseling and medication management" – were imposed solely by the Albany Clinic.  GE did not mandate, suggest or communicate to Pellant in any way that Rocha received any particular form or duration of treatment or counseling from Pellant.  (Pellant depo., pp.72-73, 75).

Pellant saw Rocha under the counseling program on one occasion before the management referral – on July 31, 2001.  (Pellant depo., pp.51-52).  She testified that the recommendation for Rocha's conditional return to work, however, was a recommendation made pursuant to the management referral to the EAP, not with respect to his previous voluntary visit for mental health counseling.  (Pellant depo., pp.51-53).

Witten testified that he was aware that Rocha was going through personal issues prior to the August 2001 incident between Rocha and Garner.  (Witten Depo., p.79).  He further testified that when he made the referral to the Albany Clinic under the EAP, he was not aware that Rocha was already receiving counseling.  (Witten depo., pp.79-80).

On March 13, 2001, Mike Phillips, Director of the Albany Clinic, wrote to Witten stating:

> I am writing this note at the request of Mr. Tim Rocha.  He reports
> missing work on March 8, 2001 due to issues regarding his family
> and possible hospitalization.[2/]

---

[2/]   Defendant has filed a motion to strike the March 8, 2001 letter of Mike Phillips.  (Doc. #54).  The motion to strike is DENIED as the letter is capable of being authenticated were a trial necessary and may therefore be considered at the summary judgment stage.  *Wright v. Southerland Corp.*, 187 F.3d 1287, 1304 n.21 (11th Cir.

On September 13, 2001, Rocha missed his appointment with Pellant.  Rocha called and apologized because he though he was supposed to meet every two weeks, rather than every week.  (Pellant depo., p.76, Pl. Exh. 7).   Pellant stressed to Rocha "the need to keep scheduled appointments," and Rocha confirmed that he would attend his next appointment on September 20.  (Pellant depo., Pl. Exh. 7).  Pellant sent Rocha a "follow-up form" telling him that he missed his September 13 appointment, and commenting, "Tim – please do keep scheduled appointments." (Pellant depo., pp.64-65, Pl. Ex. 9).

Pellant notified Linda Brooks on September 13, 2001 that Rocha had missed his appointment with her on that day.  (Pellant depo., pp.63-64).  Pellant testified that she notified Brooks because Rocha was still under a management referral, and the procedure is to report every missed appointment. (Pellant depo., pp.63-64).  On September 13, 2001 Hamilton made notes of a meeting between Hamilton, Rocha and possibly Witten.  Hamilton noted that Pellant had contacted Rocha regarding Rocha missing a personal session appointment that day.  According to Hamilton's notes, Rocha stated that he believed that GE's evaluation process was completed with the Albany Clinic.  (Hamilton depo., p.40; Plaintiff's Exhibit 9 to Hamilton depo.).

On October 10, 2001 Linda Brooks in GE's Human Resources department received a letter from the Albany Clinic informing that Rocha had contacted the clinic to "notify us that he no longer wants to receive services here" and that Rocha had cancelled all his appointments.  (Hamilton depo., p. 45, Exh. 12).  It was Rocha's sole decision to stop going to the Albany Clinic; neither GE nor Albany Clinic told him to stop coming there.  (Rocha depo., vol.II, p.85).  Pellant never sent a letter

---

1999).  Nevertheless the letter does not establish that GE was responsible for the examinations or making inquiries concerning Rocha's treatment during the course of his voluntary EAP counseling prior to the mandatory referral.  From the letter it appears that Rocha merely sought a sick leave excuse.

to GE informing that Rocha's treatment plan for the purpose GE sent him to Albany Clinic was complete, or releasing Rocha from his referred treatment plan.  (Pellant depo., p.77).

Witten elected not to terminate Rocha at that time (Witten depo., p.66) and accepted Rocha's attendance at sessions with another provider (Witten depo., pp.99-100; Hamilton depo., pp.62-63) even though he was bothered by Rocha's decision to leave the EAP and go to his own counselor because in his words, "You can go to 50 other counselors, but those other counselors don't have a clue of what we sent you for mandatory referral for, and they're not going to address any of the issues that we identified that needed to be fixed for you to work out here without creating a hostile environment for other employees."  (Witten depo., pp.94-95).

Witten testified that he told Rocha in a meeting on October 17, 2001 that he needed a signed release from the new facility because "if we were going to allow him to be treated at another facility, then that facility needed to know what we needed them to deal with.  And in exchange for that, we needed the same thing from them as we do from Albany, that, hey, you understand what our problem is that we're trying to get dealt with, and we want you to provide us information that says that Mr. Rocha is adhering to that program that you set up to try to help us deal with those behaviors.  That's the release[,] that they will tell us that, indeed, he is adhering to what they set up for him."  (Witten depo., pp.99-100).  Witten also told Rocha "you better take care of that [signing a release] tomorrow or you have a problem."  (Witten depo., pp.99,103).

Pellant testified that, in her professional opinion, she believes that personal issues for which Rocha had sought counseling affected Rocha's ability to work.  (Pellant depo., pp.77-78,83).  She also believes that treatment for Rocha's external problems, such as grief, would help Rocha cope with his stress better, help him get along better with employees at work, and help him keep from losing his temper at work.  (Pellant depo., pp.78-79).

During the October 17, 2001 meeting Rocha never expressed any confusion or asserted that he thought he did not have to follow the prescribed EAP program.  (Witten depo., p.115).  GE did not have any role in the wording of the releases by any of the doctors that Rocha saw.  (Witten depo., p.112; Rocha depo., Vol.II, pp.93-107).  The release forms were provided to Rocha solely by his own doctors, not GE.  (Rocha depo., vol. II, pp.93-107; Rocha depo., vol. II; and def's exh.11,12,14-18, 24,25).  After Rocha identified the new providers, Hamilton notified the new providers of Rocha's referral to the EAP and his failure to attend his appointments at the Albany Clinic.  (Hamilton depo., pp.63-68, Pl.exh. 16).  After Rocha identified the new providers, Hamilton wrote Counselor Brenda Baird on November 9, 2001, informing her that Rocha received a mandatory referral to the EAP managed by Albany Clinic "because of his negative behavior, attitude problems along with harassing and intimidating fellow employees in the workplace.  (Hamilton depo., Pl. exh. 16).  Hamilton also informed her that Rocha "relayed to us that he sought counseling from you instead of the Albany Clinic," "and asked the counselor to "provide [him] with the dates and times of visits, subject matter covered, and [   ] diagnosis/assessment of Tim in writing."  (Hamilton depo., Pl. exh. 16).[3/]

Rocha signed releases of information dated November 19, 2001 allowing Southern Counseling Services to provide information regarding his treatment to GE within the notation

---

[3/] The letter of November 9, 2001 was apparently in response to a release signed by Rocha and a letter from Baird as a result of the release.  The release was signed by Rocha on November 8, 2001 and directed to Southern Counseling Services and specifically authorized the release of information relating to "potential for intimidating and threatening behavior."  (Rocha depo., vol.II, def's exh. 18).  Also on November 8, 2001, Ms. Baird wrote a letter to Witten stating in pertinent part:

> Tim Rocha has requested that I provide you with information regarding his potential for threatening and intimidating behavior in the workplace.

> It is my policy to require a written request from the employer whenever I release clinical information regarding a client.  Upon receipt of this written request I will be happy to provide you with the information needed.

(Rocha depo., vol. II, defendant's exh. 19).

"Under Protest Forced by Employer."  (Defendant's exhibits 14, 16, 24 and 25 to vol. II of Rocha depo.).

On November 19, 2001, Baird corresponded with Hamilton, informing him that: "Rocha presented for his initial assessment on 10/02/01 with problems related to bereavement, anxiety, depression and conflicts at work."  (Plaintiff's Exhibit 17 to Hamilton depo).  On November 19, 2001 Dr. Scott Hellard corresponded with Hamilton, Linda Brooks and Jerry Witten informing them he had seen Rocha on October 24, 2001 and November 7, 2001 and that Rocha was scheduled for another follow-up appointment in approximately one (1) month.  Dr. Hellard stated that "Rocha appears to primarily be dealing with issues of depression, grief over the loss of a child, anxiety and what he [Rocha] perceives as persistent conflicts at work."  (Exhibit 18 to Hamilton depo.).

On March 19, 2002 Brenda Baird from Southern Counseling and Consultation Services notified Rocha that since he was not mandated to treatment there, there was no further reason to send GE any type of treatment complete letter.  Further, that Rocha had indicated to her that he had met his counseling goals and his treatment was completed.  (Defendant's exhibit 27 to vol. II of Rocha depo.).

Rocha alleges that the medical examinations and inquiries under both the initial and the continuing mandatory EAP referrals were prohibited by 42 U.S.C. § 12112(d)(4)(A) which provides:

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

While the Eleventh Circuit Court of Appeals has not decided whether § 12112(d)(4)(A) applies to a non-disabled employee,[4/] this court need not resolve this issue based on the conclusion that the examinations and inquiries are job-related and consistent with business necessity.  The examinations and inquiries pursuant to the initial EAP referral were job related because it is undisputed that Rocha and Garner had a confrontation during which Rocha overreacted and became violent over Garner's use of curse words.  Rocha had also intimidated and bullied other employees (some of whom weighed one hundred pounds less than Rocha and were substantially shorter)  by challenging them to wrestle and by blocking their exits from rail cars.

An employee's ability to handle reasonably necessary stress and work reasonably well with others are essential functions of any position." *Williams v. Motorola, Inc.,* 303 F.3d 1284, 1290 (11th Cir. 2002).  In *Williams*, the plaintiff was terminated for behavior and threats consisting of calling the department vice president a "God damned liar" and charging at him with clenched fists.  She was given the option of a medical examination in lieu of termination.  The court stated that "Motorola could have properly required a medical examination given [her] recent behavior and threats."  The court relied upon *Krocka v. City of Chicago*,  203 F.3d 507, 515 (7th Cir. 2000) which held:

> [W]here inquiries into the psychiatric health of an employee are job related and reflect a "concern [] with the safety of ... employees," the employer may, depending on the circumstances of the particular case, require specific medical information from the employee and may require that the employee undergo a physical examination designed to determine his ability to work.

In *Watson v. City of Miami Beach*, 177 F.3d 932, 935-56 (11th Cir. 1999), the Eleventh Circuit Court of Appeals held:

---

[4/]       *Roberts v. Rayonier, Inc.*, 135 Fed. Appx. 351, n.6 (11th Cir. 2005); *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1291 (11th Cir. 2002); *Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999).

> In any case where a police department reasonably perceives an officer to be even mildly paranoid, hostile, or oppositional, a fitness for duty examination is job related and consistent with business necessity. Police departments place armed officers in positions where they can do tremendous harm if they act irrationally. Contrary to Watson's contention, the ADA does not, indeed cannot, require a police department to forgo a fitness for duty examination to wait until a perceived threat becomes real or questionable behavior results in injuries.

Rocha was perceived by other employees to be threatening and intimidating, and some of these employees expressed that they were afraid of him. He had previously (in 1997) been referred to EAP for confrontational behavior with co-workers. Rocha worked in an environment where he was not closely supervised. Clearly, management could not wait for a perceived threat to manifest itself in injury to others.

In this case, Rocha was not terminated based upon his threatening behavior toward Garner or his other co-employees. Instead, GE made a mandatory EAP referral intended to ensure the Rocha would not pose a danger to his coworkers. The initial referral was clearly appropriate under *Williams* and *Watson.* Rocha has admitted that the EAP referral required that he follow the recommendations of the Albany Clinic. While the Clinic recommended that Rocha be returned to work indicating that he was not a safety concern, or, at least, not an immediate safety concern, the clinic did not recommend that he be released from the EAP referral. The Clinic recommended that Rocha continue with his appointments and medications. While he maintains that the recommendation concerning appointments and medications related to his voluntary treatment, the recommendation was in conjunction with the initial EAP referral and was made in the context of allowing Rocha to return to work. Pellant testified that, in her opinion, Rocha's inappropriate behavior at work could have been caused by the personal stress related to the death of his son and his resulting grief. It may well be that the voluntary and mandatory treatment dovetailed by virtue of the recommendation.

26

Rocha's son died approximately one year prior to the Garner incident and yet Rocha was still experiencing anxiety and frustration which evidently spilled over into his work environment. In fact a week prior to the confrontation with Garner, Rocha reported to his counselor that he had lost his temper at work. Thus, even prior to the mandatory referral, it appears that work was already the subject, at least in part, of counseling. Since Rocha had been counseled since July 2000 and reported experiencing difficulty coping at work approximately a week prior to the Garner confrontation and during this counseling process had also been challenging other employees to wrestle and blocking them into rail cars, Rocha was obviously still in need of counseling. If the clinic thought that plaintiff's work related problems were rooted in his personal problems, it was unnecessary for him to be treated both voluntarily and mandatorily for the personal problems. What was important was that he receive treatment in order that he would not pose a risk at work. The fact that he may have paid a co-pay at the Clinic following the back to work release is not determinative of whether he was being treated under his voluntary use of the EAP or under the mandatory referral to the EAP. The acceptance of the co-pay may well have been a bookkeeping error on the part of the Clinic.

Even assuming that the mandatory referral had ceased and that the counseling he was receiving was voluntary, there is nothing within the language of § 12112(d)(4) that would have prevented GE for obtaining information bearing on Rocha's ability to perform his job (i.e. to control his temper and get along with his co-workers). Rocha specifically limited the release of information by Southern Counseling Services to GE to information concerning "potential for intimidating and threatening behavior" (Rocha depo. vol. I, defendant's exhibit 18) and "attendance, identified problems" (Rocha depo. vol. I, defendant's exhibit 24).

Rocha argues that the initial referral was not done in "good faith." Specifically, he points out that Waldrep and Walden told Jeffreys they were not afraid of him and Turney told Jeffreys not to

worry about the report that Rocha pushed him into a coke machine.  He also argues that the report of the confrontation with Nowak was "indisputedly false" as evidenced by the declaration of Waites.  The Waites declaration, however, does nothing more than suggest that Nowak was a troublemaker and that Waites never saw Rocha engage in any type of threatening, harassing, abusive or intimidating behavior towards anyone.  Waites's statement does not establish that Nowak did not have the confrontation with Nowak out of Waites's presence.   While it is true that the Nowak incident occurred in 1996, the other incidents appear to have taken place closer to the Garner incident.  Nevertheless, even events occurring in 1996 if similar in nature to more current events would be relevant in determining whether Rocha was a danger to other employees. [5/]  Rocha also argues that his denial of the events which allegedly occurred prior to the Garner confrontation is corroborated by the declarations of Goad and Waites.  Waites stated that  he worked with Rocha in the warehouse in 1993/1994 and that "during the period of time I worked with Mr. Rocha, I never saw or heard him engage in any type of threatening, harassing, abusive nor intimidating behavior towards anyone, nor did I ever hear anyone make any type of complaint against Mr. Rocha."  Waites's declaration does not address the time period at issue.  Goad stated that she worked in the warehouse from October of 1998 to present with the exception of a time period from September 200 to approximately July of 2001when she worked in the warehouse office.  As previously noted with respect to the Nowak incident, Goad had only the following to say: " I never saw [Rocha] or heard him engage in any type of threatening, intimidating, abusive or harassing behavior towards anyone, nor did I ever hear anyone make such a complaint against Mr. Rocha."  The general nature of the

---

[5/]     The six month rule referred to in Jeffreys's testimony related to "written reminders" that remained active for only six months as long as the employee did not commit any other offenses within six months. After six months with no other offenses, the "written reminder" would no longer be active. (Jeffreys' depo., p. 145-56).  This "written reminder" process related to discipline.  The EAP referral would be an alternative to discipline.

declaration testimony of Waites and Goad does not corroborate Rocha's denial of the incidents but merely reflects any lack of knowledge on their part of any such incidents.

Rocha complains that Witten failed to speak to him or to Cannon in connection with the Garner confrontation. Rocha relies on Cannon's deposition testimony that Rocha and Garner got in each other's faces but that there was no physical confrontation. The court notes that in describing the confrontation between Garner and Rocha, Cannon stated eight times that he didn't remember something. (Cannon depo., pp. 46-49.)

Witten spoke to both Garner and Hallmark and believed their account of the physical confrontation between Rocha and Garner with Rocha being the aggressor as well as the reports of Rocha trapping Hallman in a railcar, slamming Turning against a coke machine, and telling people he wanted to wrestle. Witten also spoke to both Thorpe and Jeffreys who had spoken to other employees who related the threatening and intimidating behavior of Rocha. While Witten did not interview Cannon or Rocha prior to the EAP referral, the fact that Witten believed Garner and Hallmark's account of the confrontation between Garner and Hallmark and the fact that there were reports of so many incidents of potential concern to GE was sufficient to justify the EAP referral. Whether Rocha was in fact the bully that his co-employees made him out to be is irrelevant. What is relevant is whether the employer believed the reports of the co-employees. *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466 (11th Cir. 1991). Even if Witten was mistaken about Rocha's conduct, this alone would be insufficient to establish that GE did not act in good faith in making the EAP referral.[6]

---

[6] The court is not convinced that a good faith requirement is grafted into 42 U.S.C. § 12112(d)(4); however, the foregoing discussion assumes, without deciding, it is.

Rocha complains that Garner, Cannon and Hallman were not given mandatory EAP referral based on their confrontations with co-workers.  Specifically, he alleges that Garner was not  given a mandatory EAP referral for his  tactless and  ill-advised comment to Seymor that she should take a gun and blow her brains out if she was so miserable or for his comments to Kellum in which he told Kellum to say away from his [Garner's] wife.  Rocha also complains that Cannon and Hallman were not given a mandatory EAP referral for their rude comments (Cannon cursing her on one occasion and Cannon and Hallman telling her on several occasions "shut up" and "I can't stand to even hear your voice.").  The conduct of Garner toward Seymor and the conduct of Cannon and Hallman toward Goad may have been inappropriate in the sense of being thoughtless, tactless, ill-advised or rude; however, the conduct was not threatening or intimidating as was the behavior of Rocha.[7/]  To the extent that comparison might be relevant,  these employees would not be comparators as their conduct was not "nearly identical" to the conduct of the plaintiff.  *Morris v. Emory Clinic*, 402 F.3d 1076, 1082 (11th Cir. 2005); *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989).

Based on the foregoing, defendant's Motion for Summary Judgment  (doc. #40) is due to be GRANTED.  A separate final judgment consistent with this Memorandum of Opinion will be entered simultaneously herewith.

As to the foregoing it is SO ORDERED this the 31st day of March, 2006.

_____

PAUL W. GREENE
CHIEF MAGISTRATE JUDGE

---

[7/]     The court cannot say that Garner's conduct toward Kellums rose even to the level of thoughtless, tactless, or rude in light of Garner's uncontradicted testimony of what transpired in his conversations with Kellum.